**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**

***ELECTRONICALLY FILED***

**JANE DOE;**                                    CASE NO. _____

       Plaintiff,

                                             **COMPLAINT FOR**
                                             **DAMAGES AND**
                                             **DEMAND FOR JURY TRIAL**
                                             **(INJUNCTIVE RELIEF SOUGHT)**

v.

**THE UNIVERSITY OF KENTUCKY,**

       Serve:  Attorney General, Andrew Beshear
              Office of the Attorney General
              700 Capitol Avenue, Suite 118
              Frankfort, KY 40601

and

**Dr. Eli Capilouto, Individually and in his**
**capacity as President of the University of Kentucky**

       Serve: Attorney General, Andrew Beshear
             Office of the Attorney General
             700 Capitol Avenue, Suite 118
             Frankfort, KY 40601
and

**Patty Bender, Individually and in her**
**capacity as Assistant Vice President for Equal Opportunity**

       Serve: Attorney General, Andrew Beshear
             Office of the Attorney General
             700 Capitol Avenue, Suite 118
             Frankfort, KY 40601

and

1

**Nicholas Kehrwald, Individually and in his
capacity as Interim Dean of Students**

      Serve: Attorney General, Andrew Beshear
            Office of the Attorney General
            700 Capitol Avenue, Suite 118
            Frankfort, KY 40601

            Defendants.

_____

Comes the Plaintiff, Jane Doe[1] (hereinafter "Ms. Doe" or "Plaintiff"), by counsel, and for her Complaint against the Defendants The University of Kentucky (hereinafter "UK"), Dr. Eli Capilouto, Patty Bender, and Nicholas Kehrwald states herein as follows:

## INTRODUCTION

1.      This is an action involving claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (hereinafter "Title IX") and various state law causes of action, arising out of sexual assault.

## PARTIES, JURISDICTION AND VENUE

2.      Ms. Doe is a citizen of the Commonwealth of Kentucky, who currently resides in Fayette County, Kentucky.

3.      The Defendant UK is a government educational institution with its primary campus in Lexington, Kentucky.  UK's campus is located in the region of the U.S. District Court in the Eastern District of Kentucky, Central Division at Lexington.  Defendant UK is a legal entity created by the Kentucky General Assembly and located in Fayette County, Kentucky.

_____

[1] Plaintiff proceeds here under pseudonym consistent with other Federal Courts' treatment of party names in highly sensitive sexual assault cases that arise under Title IX of the Education Amendments, *see e.g. Doe v. Erskine College*, Case No. 8:04-23001, 2006 WL 1473853 (D.S.C. May 25, 2006), and to protect the privacy, safety, and educational opportunities of Plaintiff.  Defendant is aware of the identity of the Plaintiff and will not be otherwise prejudiced by proceeding in this fashion.  If needed, Plaintiff will seek other appropriate relief form the Court to continue to proceed in this fashion and to otherwise protect her anonymity throughout the instant litigation.

4.      The Defendant Dr. Eli Capilouto is employed in Fayette County, Kentucky and during all times relevant to this Complaint, Defendant Capilouto served as President of UK.  As President of UK, Defendant Capilouto has a legal duty to ensure UK's compliance with the requirements of Title IX.  Furthermore, it is believed Defendant Capilouto is the superior of the University representative assigned to Ms. Doe's case, Nicholas Kehrwald.

5.      Defendant Patty Bender is employed in Fayette County, Kentucky and it is believed that during all times relevant to this Complaint, Defendant Bender served as Assistant Vice President for Equal Opportunity at UK.  The Defendant Bender has a legal duty to ensure UK's compliance with the requirements of Title IX.

6.      Defendant Nicholas Kehrwald is employed in Fayette County, Kentucky and during all times relevant to this Complaint, Defendant Kehrwald served as Interim Dean of Students at UK.  Defendant Kehrwald was the University representative assigned to Plaintiff's initial Title IX case.

7.      Defendant UK receives federal funding and financial assistance within the meaning of 20 U.S.C. §§ 1681 (a) and is otherwise subject to Title IX.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S. §§ 1331 and 1343.

9.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

10.     Plaintiff brings this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-1688, as more fully set forth herein as well as state law claims.

11.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state law claims because they "form part of the same case or controversy."

12.     The amount in controversy exceeds the minimum jurisdictional limits of this Court exclusive of interest and costs.

13.     Venue is proper in the Central Division at Lexington of the U.S. District Court in the Eastern District of Kentucky pursuant to 28 U.S.C.§ 1391(b)(1) and (2) because, *inter alia*, upon information and belief these Defendants reside and work in the Central Division at Lexington in the Eastern District of Kentucky and are subject to this Court's personal jurisdiction.

14.     All conditions precedent to the maintenance of this suit and Plaintiff's claims have occurred or been affirmed.

### General Allegations

### SUMMARY

**A. The Plaintiff is accepted to and enrolls at UK**

15.     The Plaintiff was accepted in UK as an Otis Singletary Scholarship recipient in the fall of 2015.  The Singletary Scholarship is a competitive scholarship awarded to students who have a minimum ACT score of 33 or 1490 SAT and a minimum unweighted GPA of 3.80 on a 4.0 scale. Additionally, Plaintiff was also a resident advisor (RA) and thus, a campus leader and campus employee.  As an RA, Plaintiff was trained on Title IX proceedings and Plaintiff soon found out, that that training did not coincide with the way the Title IX office actually enforced policies relating to Title IX.

4

16.     Singletary Scholars as a group, attend numerous functions on campus and are often involved in the same social circles.  The perpetrator, who will be referred to in this Complaint as "John Doe"[2] who sexually assaulted Plaintiff, was also a Singletary Scholar and, therefore, the Plaintiff and perpetrator were involved in many of the same social circles and campus activities.

**B.  The First Sexual Assault**

17.     On August 20, 2016, John Doe sexually assaulted Plaintiff in his apartment.

18.     The Office of Institutional Equity and Equal Opportunity (hereinafter "IEEO"), which is the office at UK that handles Title IX matters, received a report on or about September 13, 2016 from a student other than the Plaintiff, alleging that John Doe had engaged in vaginal sexual intercourse with the Plaintiff without her consent.

18.     Deputy Title IX coordinator Martha Alexander then met with Plaintiff at the Violence Intervention and Prevention (VIP) Center at UK on September 15, 2016.  Plaintiff requested a No Contact Order on October 6, 2016 against John Doe.

**C.  The Plaintiff begins to suffer socially and academically as a result of the sexual assault**

19.     On November 9, 2016, Plaintiff stated she wanted to participate in a formal investigation against John Doe.  Defendant UK began a formal investigation which was completed on December 16, 2016.  At the first meeting with the Title IX office, Plaintiff reported her concern that her and John Doe shared many of the same friends in the same social circle (members of a certain fraternity) and she was concerned about seeing him in social settings.

20.     Part of the college experience is the various social settings and events that students are encouraged to participate in, including Greek life.  In fact, Defendant UK even boasts of the benefits of joining a fraternity or sorority, stating, "There are many benefits to joining a fraternity

---

[2] The perpetrator will simply be referred to "John Doe" in this pleading, as Plaintiff is not filing this lawsuit against the perpetrator.

or sorority at the University of Kentucky.  Fraternity men and sorority women have the opportunity to be connected as a part both a (sic) local chapter and an inter/national organization.  Sororities and fraternities give students many opportunities (sic) build their leadership skills and to take on leadership roles within the chapter and the governing councils.  Additionally, the supportive network of peers on campus helps boost academic performance, connection to the campus community, and provide opportunities for community service."[3]

21.     Despite Plaintiff's concern that her social life would be greatly inhibited and she would no longer be able to associate with many of her friends in John Doe's fraternity, Title IX responded that they had no control over John Doe's social standing, despite the fact the group that John Doe was involved in that Plaintiff shared many friends with was a fraternity on campus, which undoubtedly was overseen by Defendant UK's Fraternity and Sorority Life which "…is the office that oversees and advises the social and cultural fraternities and sororities at the University of Kentucky.  The office assists chapters with programming, risk reduction, scholastic excellence, and event planning.  Additionally, the office works with the governing councils in many of the same areas as well as encouraging self-governance and growth."[4]

22.     The Title IX office stated they could provide a No Contact Order against John Doe but that if she wanted something to happen in a social setting, she would have to deal with it herself.

23.     Plaintiff then talked to the fraternity and told the chapter president about what had happened and stated she still wanted to associate with her friends in the fraternity but not be around the man who sexually assaulted her.

---

[3] http://www.uky.edu/greeklife/frequently-asked-questions
[4] http://www.uky.edu/greeklife/frequently-asked-questions

24.     The fraternity then met and decided John Doe would have a "sober buddy" who would stay sober while John Doe would attend functions to monitor his behavior.   Plaintiff then talked to the Title IX office about this and they again asserted they did not control fraternity affairs in any way and that Plaintiff would need to speak to someone involved in the fraternity at the national level.

25.     The Plaintiff was then retaliated against by members of John Doe's fraternity.   For example, on March 24, 2017, a member of John Doe's fraternity approached Plaintiff, put a finger against her chest and said, "Fuck you" to the Plaintiff.   The Plaintiff left the area immediately and reported the retaliation to Title IX who assured her that this behavior was not acceptable and that they would conduct an investigation and potentially bring that student before a student conduct board.   The Plaintiff never heard back from Title IX regarding this matter.

26.     Moving forward, Plaintiff attempted numerous times to study at the library during the 2016 fall semester, but often saw John Doe there and as a result felt unsafe and threatened. Plaintiff reported this to the Title IX office multiple times and requested a small corner of the top floor of the library be designated a "No Contact Zone" so that Plaintiff knew where she could safely study in peace without fear of seeing the perpetrator.

27.     Title IX informed the Plaintiff that this would limit the educational opportunities of the perpetrator and they could not do so "without reason".   As a result, Plaintiff was forced to study in the library from 2:00 A.M.-8:00 A.M. every day before her classes as this was the only time she knew she would be safe from the perpetrator and his fraternity.   Ultimately, Plaintiff got to the point where she felt she had no safe space in the library to study.

28.     Throughout the Title IX investigative process, Plaintiff had to take time out of her demanding course schedule and meet with the Title IX office numerous times, including but not

limited to: September 15, 2016, October 6, 2016, October 16, 2016, November 9, 2016, November 17, 2016, November 21, 2016 and January 9, 2017.   Additionally, Plaintiff had to regularly correspond with the Title IX office via email and telephone.  Despite the vast amount of time Plaintiff spent with the Title IX office, Title IX prepared only three pages of notes summarizing Plaintiff's testimony.

29.     In one of the meetings with the Title IX office, the Plaintiff was questioned as to whether she "really was a virgin" when the sexual assault occurred; inquiring into her prior sexual history was not only inappropriate, but traumatizing, since the nature of the question insinuated to Plaintiff she was not being truthful.

30.     At one point, the Plaintiff reported the perpetrator as coming near her at a tailgate (who the Plaintiff was told he would not be at) and for following her home from class one day (November 7, 2016) to Deputy Title IX coordinator Martha Alexander.  The Plaintiff reported both of these events as violations of the No Contact Order.   The Plaintiff was told that neither of these events "counted" as a violation by the Title IX office and that she should just avoid the places that he was likely to be.  This proved to be very difficult for Plaintiff since the perpetrator lived by her.

31.     During the winter break of 2016, Plaintiff was then told that she wasn't allowed to attend any events of the fraternity the perpetrator was involved in.  This essentially prevented Plaintiff from engaging in any social or academic functions with any member of the fraternity. This was especially detrimental to Plaintiff who was friends with many members of the fraternity and she began to feel isolated.  Plaintiff felt this action was retaliation and reported it to the Title IX office over the winter break.  Plaintiff did not receive a timely response from Title IX (because apparently no one from Title IX was working during the winter break).  When Plaintiff finally did

hear from Title IX, she was told that this was not retaliation because the fraternity house was a privately owned house and Title IX had no control over the fraternity.

32.     Early in the spring semester of 2017, Plaintiff, so frustrated with the Title IX office and feeling she was at an administrative dead end, reached out to one of the deans who had recruited her to attend UK, Don Witt, and expressed that despite having spent countless hours in Title IX meetings in the previous semester fighting for her rights, she had serious concerns about how the office was handling her case.

33.     The Title IX office then updated the No Contact Order to forbid Plaintiff from interacting with any member of the fraternity in any way, whether formally or informally.  Plaintiff was then at a tremendous loss because she had many close friends in the fraternity and after reporting being sexually assaulted, it had appeared that the Title IX office was taking a position that Plaintiff was somehow a threat to all members of the fraternity by forbidding her from having any contact with any of them.  Plaintiff believes this was clear retaliation.

34.     With a fraternity of over 150 members, Plaintiff felt it would be almost impossible to comply with the terms of the No Contact Order since fraternity members could be present at numerous locations on campus that Plaintiff was also.

35.     A few days later, the Title IX office admitted that they had been harsh in issuing the blanket No Contact Order against Plaintiff and all members of the fraternity and the No Contact Order was amended to provide that Plaintiff was allowed to attend fraternity sponsored events if she received permission from the host of the event.

36.     Around January 9, 2017, the Title IX office informed Plaintiff that there wasn't enough evidence to bring Plaintiff's case in front of the Sexual Misconduct Hearing Board[5].  Title

_____

[5] The Sexual Misconduct Hearing Board is a 3-person hearing panel consisting of a chair and two (2) other members selected by IEEO to resolve alleged violations of UK's policy relating to sexual assault. Members are chosen from

IX informed Plaintiff that their job was to gather information from both sides and compile it together and that the burden of the evidence was "more likely than not", and if they found that, the matter would move forward to a hearing.

37.     Plaintiff was incensed that the determination had been made by Title IX not to have the hearing after she had provided Title IX with text messages, voice mails, and a statement from her resident advisor, had met with Title IX for five months, once a week and did everything requested of her.  She protested and asserted she deserved a chance for the Panel to hear her case.

38.     Title IX decided to re-evaluate Plaintiff's case and a week later, around January 12, 2017, they reviewed the evidence again and decided to set it for a hearing.  They then informed Plaintiff of the hearing procedures going forward and explained that Defendant Nicholas Kehrwald would be Plaintiff's University representative for the hearing.

39.     The Plaintiff, hoping to get her case behind her, was then told a hearing would not occur until February 24, 2017, over three months after Plaintiff had said she wanted to pursue a formal hearing.

40.     On January 24, 2017, the Plaintiff was handed a copy of the investigative report that surrounded Plaintiff's complaint relating to John Doe in the Title IX office.  Plaintiff was asked to read the extensive report and give any corrections.

41.     Reading the report was immensely traumatizing to the Plaintiff and she was rushed to complete it within an hour.  Due to this fact, Plaintiff was only able to address a few places of concern as she was not given enough time to thoroughly read the report.

---

faculty and staff employees who have received annual and ongoing training by IEEO related to sexual assault, domestic violence, dating violence, and stalking.  The Board is presented evidence by both sides and then determines whether the sexual assault occurred and if so, what the proper punishment is.

42.     The Title IX office scheduled for John Doe to read the report immediately after Plaintiff.  John Doe entered the office that Plaintiff was in while she was still present (despite Title IX being fully aware of the No Contact Order) and Plaintiff was then pulled back into Martha Alexander's office and told to wait so that John Doe could be moved to a different room to allow Plaintiff to exit without seeing him.  Plaintiff still had to hear John Doe's voice which was re-traumatizing.

**D. Nicholas Kehrwald is assigned to represent Plaintiff in the Sexual Misconduct Hearing**

43.     After it was determined the matter would go to the Sexual Misconduct Hearing Board, Plaintiff was assigned Defendant Nicholas Kehrwald as the University representative for the hearing.  Kehrwald is an Interim Dean of Students at UK.  Nick Kehrwald's previous position was the University of Kansas's first director of Student Conduct and Community Standards.[6] When Kehrwald left KU to be employed by UK, KU was being investigated by the U.S. Department of Education's Office for Civil Rights after receiving complaints about their handling of one or more sexual assault cases.[7]   Additionally, Kehrwald had made headlines when he proclaimed that community service for a student who had nonconsensual sex with another student was too harsh a punishment.[8]

44.     What is of particular importance regarding Mr. Kehrwald is he apparently oversaw the Director for Fraternity and Sorority Life, Susan West[9], so it is unclear how Title IX was not able to make any accommodations for Plaintiff regarding her issues with fraternity functions.

---

[6] http://www2.ljworld.com/news/2014/dec/12/key-administrator-sex-assault-hazing-investigation/
[7] *Id.*
[8] http://www2.ljworld.com/news/2014/sep/13/ku-prosecutors-face-challenges-rape-investigations/
[9] http://www.uky.edu/deanofstudents/sites/www.uky.edu.deanofstudents/files/Dean_of_Students_Org_Chart_UPDATE_0.pdf

45.     Title IX informed Plaintiff that she would not need a lawyer for the Sexual Misconduct Hearing because Mr. Kehrwald would be serving as her legal representation.  Mr. Kehrwald told Plaintiff that he had a law degree and held himself out as a good lawyer and Plaintiff reasonably believed he would be serving as her lawyer in the hearing.  Plaintiff assumed that Mr. Kehrwald was her attorney and that she had some semblance of an attorney-client privilege with him.  Plaintiff said no one at the Title IX office ever told her she had any other options for a different person being assigned to advocate on her behalf.

46.     Thereafter, Mr. Kehrwald failed to provide Plaintiff with reasonable and timely communications regarding the hearing process or inform her of rights.

47.     It was Plaintiff's understanding that Mr. Kehrwald would be advocating on her behalf at the Sexual Misconduct Hearing, helping her to prove her case, that the sexual assault did occur.

48.     Plaintiff was told that at the hearing, she could have two support people but, if one was an attorney, that an attorney could not actually participate in the hearing in any way.  This was consistent with UK's Policies and Procedures for the hearing panel as is described below:

> VI.  Formal Hearing Procedures
>
> E.     The complainant and the respondent have the right to be assisted by a support individual(s) of his/her choice and at his/her own expense.  Support individual(s) are not permitted to speak or to participate directly in any hearing.[10]

49.     A day or two before the hearing on February 24, 2017, the Plaintiff was finally sent a document with all the information regarding how evidence would be submitted and what the policies and procedures would be that would dictate the hearing.  Included in that information was

---

[10] University of Kentucky Procedures for Allegations of Sexual Violence, Stalking, Domestic Violence and Dating Violence

a policy that said evidence to be presented at the hearing was to be submitted at least six days before the hearing.

50.     Plaintiff then discussed with Defendant Kehrwald a voicemail that she wanted to be presented at the hearing, which was left by Plaintiff on a friend's voicemail within a few hours of the sexual assault.  Plaintiff asserted this was essentially "best evidence" that she needed to present at the hearing to help prove her intoxicated state of mind to show that consent was not possible, since the voicemail involved Plaintiff crying, while slurring her speech and asking a friend for help.  Defendant Kehrwald never submitted the voicemail to be included in the hearing and his response to Plaintiff can be summarily described as, "Oops, my bad."

**E.  The Sexual Misconduct Hearing Panel is held and Defendants violate their own Policies and Procedures and prevent Plaintiff from having a fair hearing**

51.     On February 24, 2017, Plaintiff was ready to begin at 9:00 A.M. when the Sexual Misconduct Hearing Panel was scheduled when various administrators went off into another room. Defendant Kehrwald then pulled the Plaintiff aside and said there was a problem; one of the people selected to participate in the hearing had a conflict of interest, as Defendant Kehrwald was apparently a supervisor of one of the hearing panel members.  It became apparent that Defendants did not properly perform a conflict check before scheduling the hearing.

52.     Plaintiff then had to sit for three hours in a room with the perpetrator while the Defendants ironed out their administrative failures regarding properly screening for a conflict of interest.  This was traumatizing to the Plaintiff to have to be in the same room as the perpetrator and then be told that she would have to wait yet again for the hearing to occur.

53.     As a result of the conflict of interest, the hearing had to be rescheduled to a later date.  Due to the procedural failures of the Defendants, Plaintiff had to cancel an entire day for

the first initial hearing and then had to cancel another day for the second subsequent hearing date. Additionally, Plaintiff had been mentally prepared to go through with the hearing on February 24, 2017 and then had to wait even longer to ultimately go through the hearing, essentially dealing with the stress of the postponed hearing while attempting to study and prepare for classes. Additionally, the new hearing date of March 3, 2017 occurred the Friday before exam week so Plaintiff had to devote a great deal of time preparing for and stressing out about the hearing instead of studying for finals.

54.     Plaintiff then asked that since the hearing would be further delayed that she be able to present the voicemail, which she believed was a critical piece of evidence.  At that point, an attorney for the perpetrator stood up and made an oral motion to exclude the voicemail from the later hearing date as well as any other evidence from being submitted.  The Hearing Board officer, Robert Dyche, heard and entertained the motion and ordered that the record be closed and no additional evidence was allowed to be submitted at the later hearing date.

55.  The fact that the perpetrator had an attorney stand up and speak was in direct violation of Defendant UK's own Policies and Procedures which dictated the Sexual Misconduct Hearing Board as previously described in paragraph 48.

56.     After the postponed hearing, Plaintiff emailed Defendant Kehrwald and asked why the voicemail had not been included in her submissions, especially since she had provided it to Title IX office in September of 2016 and it was part of the Title IX office's investigative report.

57.     The hearing was then postponed until March 3, 2017.  At that hearing date, another woman was present in the room and Plaintiff was informed it was the wife of Hearing Board officer, Dyche and she was observing for training purposes.  Plaintiff, who was already having to endure divulging the excruciating and traumatizing details of the sexual assault to a room of

complete strangers (i.e. the members of the Sexual Misconduct Hearing Panel) would now have to endure having another person present in the room. Plaintiff described feeling like a "zoo animal" that was being watched by everyone. This further traumatized the Plaintiff and no one ever asked if she approved someone observing the hearing for training purposes.

58.     This was also especially concerning since FERPA should have required Defendant UK get Plaintiff's written permission for this woman to sit in and hear details concerning Plaintiff's educational record.

59.     At the hearing on March 3, 2017, the perpetrator was present with two attorneys. One of the attorneys, James Lowry, would ultimately interject and speak in the hearing, totally blindsiding the Plaintiff who was told, per written policy and procedure, that attorneys were not allowed to speak in these hearings.

60.     The Plaintiff would then endure an excruciating 10-hour hearing. Throughout the entire hearing, the Plaintiff pleaded with Defendant Kehrwald to object and interject numerous times, yet he failed to do so even once.

61.     During the hearing, Plaintiff made her opening statement at the beginning. The last five hours of the hearing was information presented from the perpetrator to the hearing panel to which the Plaintiff was then not allowed to rebut or defend herself.

62.     At one point in the hearing, Plaintiff wrote to Defendant Kehrwald, "I don't think he's allowed to talk", referring to John Doe's attorney. Defendant Kehrwald responded, "Trust the process." Plaintiff felt totally underrepresented and sabotaged at the hearing due to the fact that John Doe had two attorneys who essentially treated the hearing as a court room.

63.     During the hearing, the attorneys for John Doe questioned Deputy Title IX advisor Martha Alexander who had worked on Plaintiff's case. The attorney specifically asked Ms.

Alexander about the other Title IX case that Plaintiff had filed (which will be discussed in greater detail below).  Plaintiff believes this extremely prejudicial information should have never been allowed to have been brought up or mentioned in this hearing since the other Title IX case had to do with a completely different incident and student.  Allowing the attorney to question Plaintiff about another complaint of sexual assault shows a clear gender bias on behalf of Defendant UK.

64.     In fact, in the closing argument made by John Doe's attorney at the hearing, he remarked to the panel, "She's got another case going.  Another allegation with someone else.  Let that play out.  But this one she is badly mistaken.  Thank you."

65.     Throughout the hearing Plaintiff was sobbing and John Doe's attorneys were allowed to talk for hours about her social choices and her going to fraternity/sorority events.  Additionally, the parties discussed the Plaintiff's appearance that night.  By Defendant UK allowing this line of highly inappropriate and irrelevant questioning, Defendant UK allowed clear gender bias to dictate the entry of evidence in the hearing.

66.     At one point in the hearing, Defendant Kehrwald handed Plaintiff a document which had pictures of John Doe's bedroom.  This triggered flashbacks and caused the Plaintiff to become extremely upset after seeing the essential crime scene of where she was sexually assaulted.

67.     The bedroom pictures were never disclosed to her before the hearing and were not on the Exhibit List of John Doe.  The Plaintiff asked Defendant Kehrwald to make a motion to exclude the pictures of the bedroom, yet Defendant Kehrwald failed to make the motion.  Therefore, John Doe was able to introduce additional evidence that was not on his disclosed Exhibit List, yet Plaintiff was not allowed to present evidence of her voicemail which would have been the best evidence to prove her state of mind around the time of the assault.  This was yet another fundamentally unfair procedural matter that Defendants allowed to occur in the hearing.

**F.  The Sexual Misconduct Hearing Board finds no sexual assault occurs and Plaintiff appeals the decision**

68.     At the end of the hearing, the Panel, not surprisingly, found that John Doe was "not responsible" for the sexual assault of Plaintiff and the Plaintiff was told what the procedure would be for an appeal of the decision.

69.     Devastated with the ruling of the Sexual Misconduct Appeals Board, the Plaintiff contacted Defendant Kehrwald and asked for assistance in drafting her appeal, to which Defendant Kehrwald responded in his "professional opinion" that the appeal wouldn't be worth her time.  The Plaintiff then sought other remedies and contacted her current counsel, Lindsay Cordes.  Ms. Cordes then helped the Plaintiff draft and file an appeal on March 3, 2017.

70.     The Appeal was assigned to the Sexual Misconduct Appeals Board (SMAB) at UK.

71.     In response to Plaintiff's Appeal, Defendant Kehrwald, who had represented himself to the Plaintiff as advocating for her interests, wrote an 11-page response, asserting why Plaintiff's **appeal should not be granted.**

72.     This seemed like a direct contravention of the position that Defendant Kehrwald was supposed to take, in representing the Plaintiff and her interests at the initial Sexual Misconduct Hearing Board and attempting to prove that sexual misconduct occurred and then turning around and filing an 11-page response as to why her appeal should NOT be granted.  This was a clear conflict of interest and sheds doubt on the entire Sexual Misconduct Hearing process.

73.     Ultimately the SMAB denied the Plaintiff's appeal for numerous reasons.  What is important to note, in their decision to deny Plaintiff's appeal, Defendant UK admitted to violating its own Policies and Procedure in the Sexual Assault Hearing Board process.  When Plaintiff asserted the Hearing was procedurally unfair because John Doe had an attorney that was present

17

as a support person that actively participated (in violation of UK AR 6:2), the SMAB responded, "At the hearing, Landry[11] participated in a complete and professional manner. He gave an opening statement on (redacted) behalf, conducted questioning, and made closing remarks. This behavior was an unequivocal deviation from AR 6:2 App., VII.D.8. The issue before the SMAB is whether Landry's actions violated the parties' due process rights. The Hearing Officer does not have the opportunity to submit a response to an appeal; therefore, it is impossible to know with certainty his reasoning for allowing Landry to participate in the hearing on (redacted) behalf. Ideally, the Hearing Officer should have generated a written or oral record before or during the Hearing so as to why he was allowing the procedural change."

74. The SMAB subsequently found, "This is a difficult claim because the SMAB is siding squarely against a written procedure; however, our polestar is fairness. The Hearing Officer is an experience retired judge. The University Representative is an attorney. For better or worse, the Hearing had many features of a courtroom proceeding. (Redacted) retained an attorney, and it expands the notions of due process for that attorney to participate in a meaningful manner. While not explained at the Hearing, the Hearing Officer's decision worked to increase the parties' rights and Hearing's fairness. The principles of due process, particularly for (redacted), were protected by the Hearing Officer's decision."

75. Additionally, the Plaintiff asserted that she was to be provided a copy of the preliminary hearing questions per UK AR 6:2 which provides, "The Title IX Coordinator, in consultation with the Hearing Officer, shall create the formal hearing file. Copies of the formal hearing file shall be made available to all parties and the Hearing Panel members at least three (3) business days prior to the hearing and shall contain the Title IX investigator's report, list of

---

[11] Plaintiff assumes that Defendant UK intended to write "Lowry" since the attorney for John Doe was James Lowry.

witnesses, preliminary questions submitted by parties, and any other related information."  The Plaintiff never received a copy of those questions and if she had, likely would have been aware of the traumatizing questioning that was to come surrounding the bedroom photographs which were described in paragraph 66 as well as the questions that would be asked of Plaintiff about her social choices and appearance.  The SMAB responded, "In compiling the formal hearing file, the Title IX Coordinator and the Hearing Officer excluded the preliminary questions submitted by the parties.  This was an unequivocal deviation from AR 6:2 App., VII.D.5."

76.   When Plaintiff asserted that Defendant Kehrwald did not adequately represent her interests at the Sexual Misconduct Hearing, the SMAB responded, "The University representative did work with (redacted) in presenting arguments about this incident, however, this was akin to a prosecutor working with a victim.  The University Representative is focused on protecting the University community.  The goal is often aligned with a complainant; however, the University and the complainant might have diverging interests and tactics." Plaintiff asserts was she not a member of the "University community" that the University Representative was supposed to protect?  It is the Defendants fault for failing to be clear and straightforward that Defendant Kehrwald actually wasn't representing Plaintiff's interests in the Hearing and was representing the University's, especially since Defendant Kehrwald held himself out as her lawyer.

**G.  The Title IX process was extremely traumatizing and caused Plaintiff to lose out on equal educational opportunities at UK**

77.   Throughout the entire ordeal, the Plaintiff had to meet with the Title IX office various times and this involved her having to have her classes moved as well as reschedule certain obligations.  This caused a great burden on Plaintiff being able to continue her classes in the semester.  Plaintiff met with the Title IX office nearly once a week from September 2016 to March

2017, adding up to over 50 hours of lost educational time on top of the Plaintiff's lost time in attempting to cope with the sexual assault. This lost time doesn't even include time that Plaintiff incurred in attempting to coordinate social safety with the fraternity since Defendant UK refused to offer any help in that area.

78.     Additionally, Plaintiff was often too scared to walk to class because of the sexual assault and had to have exams moved. There were numerous times when Plaintiff could not go to the library without seeing her perpetrator or being pointed out by one of his fraternity brothers.

79.     At one point, Plaintiff even begged the Title IX office for a designated "safe area" in the library that she could go to, that John Doe was not allowed to go to. She also told the Title IX office that numerous times she couldn't focus on class, felt she could not safely walk on campus and was losing all of her friends (because of the conflicting issues with her being unable to participate with friends in the same fraternity of John Doe). Additionally, Plaintiff was told to restrict her actions and avoid places she knew that John Doe would likely be, which proved difficult since Plaintiff and John Doe shared many of the same circle of friends and were both Singletary Scholars.

80.     To date, Defendant UK made no finding that sexual assault occurred between Plaintiff and John Doe and denied Plaintiff's Appeal. Plaintiff is now forced to attend campus with her attacker and is in constant fear for her safety and well-being and therefore continues to be subjected to a sexually-hostile environment. In fact, it is unclear whether Plaintiff will be able to continue her education at the University of Kentucky.

**H.  The second sexual assault**

81.     On or about October 10, 2016, Plaintiff was sexually assaulted by another perpetrator (hereinafter identified by the pseudonym of James Doe) who was Plaintiff's lab partner

from her physics class.  After the assault, Plaintiff went to UK Hospital and was given a SANE (sexual assault nurse examiner) exam and reported the rape to the UK Police Department ("UKPD") as well as Lexington Police Department.

82.     The Title IX office received notification of this matter through a report filed by two other students (who will remain nameless to protect confidentiality), alleging that James Doe engaged in vaginal sexual intercourse with Plaintiff while she was incapacitated.

83.     Martha Alexander, Jeremy Enlow (another employee at UK in the Title IX office) and Plaintiff met in the VIP Center at UK on October 13, 2016 wherein Plaintiff stated she did not want to participate in a formal investigation.  This is due to the fact that Plaintiff had had such a traumatizing experience in reporting and working with the Title IX office regarding the first sexual assault allegation.  Nonetheless, Title IX informed Plaintiff it might be obligated to proceed formally regardless of her wishes due to the nature of the allegations.

84.     Plaintiff requested a No Contact Order against James Doe on October 27, 2016.

85.     On November 10, 2016, after feeling threatened and unsafe, Plaintiff requested that James Doe be moved from her shared lab section.

86.     Ultimately, it took the Title IX office a month to remove James Doe from Plaintiff's physics lab after he had sexually assaulted her and Title IX failed to protect Plaintiff from James Doe's continuous harassment.

87.     Despite feeling threatened at that point in time, the University did not even engage in a formal investigation until January 6, 2017, which did not conclude until January 23, 2017.

88.     Further delaying, Jeremy Enlow did not present his investigation findings to Title IX Coordinator Patty Bender until March 27, 2017, over 180 days after the sexual assault was first reported.  Only then did Patty Bender determine the matter should be presented to the Sexual

Misconduct Hearing Board.  Plaintiff received notice of the investigation findings on March 29, 2017.

89.  The Title IX office reported that it attempted to make contact with James Doe on a multitude of occasions yet failed to do so.  It is believed that during this time, absolutely no restrictions or oversight were in place regarding James Doe and it is entirely possible he was able to sexually assault other students.

90.  The Sexual Misconduct Hearing Panel met on April 28, 2017 and found James Doe responsible for violating the Code of Student Conduct and immediately dismissed him from UK.

**I. The Defendants' clearly unreasonable response to Plaintiff's various reports of sexual assault caused her to experience a loss of educational opportunities**

91.  Conclusively, Title IX and basic principles of state tort law such as negligence, require that a school provide prompt and equitable resolution of sex discrimination complaints and provide reasonable accommodations so that students do not suffer from further effects of sex discrimination.  However, Defendant UK's process, in handling Plaintiff's cases, can be described as anything but prompt and equitable.  It took Defendant UK over six months to finally reach a resolution on Plaintiff's initial complaint of sexual assault. Throughout that time, Plaintiff suffered immensely.

92.  Due to the actions (or inactions) of the Defendants, the Plaintiff experienced a loss of educational opportunities, including but not limited to a loss of an educational space to safely study, a loss of social rights and protections, a loss of feeling safe while on campus, a loss of time correlated with Plaintiff's academic preparation and success due to the many times Plaintiff had to meet with Title IX, and Title IX's failure to provide a prompt and equitable resolution to

Plaintiff's Title IX complaint against John Doe.  In addition, Plaintiff has suffered great emotional pain and suffering.

**COUNTS AGAINST DEFENDANT UK**

**COUNT I:**

**Violation of Title IX-20 U.S.C. § 1681 (a)**

**(Clearly Unreasonable Response)**

93.    Plaintiff re-alleges and incorporates the allegations set forth above in paragraphs 1-92 as though fully set forth herein.

94.    Defendants had actual knowledge of Plaintiff's sexual harassment and discrimination at the hands of her perpetrator.

95.    The discrimination, consisting of perpetrator's sexual assault against Plaintiff, the risks to Plaintiff's safety, the physical and mental harm caused to the Plaintiff, and Defendants' responses to Plaintiff's grievance was so severe, pervasive and objectively offensive that it barred Plaintiff's access to educational opportunities and benefits.

96.    The Plaintiff was subjected to the discrimination because of the Defendants' deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

(a)    Defendants' deliberate decision to not provide Plaintiff with safety measures and accommodations so that she could safely pursue her studies and enjoy the traditional benefits of a college education, including social functions and events;

(b)    Defendants requirement that Plaintiff meet at the Title IX office numerous times over a course of five months, throughout the course of their

investigation, thereby putting an undue burden on Plaintiff and requiring

her to recall the traumatic experience each time she met as well as requiring

her to take time out of class to attend meetings;

(c)     Defendants' deliberate decisions not comply with their own policies on

sexual misconduct, Title IX and sexual harassment, as well as legal

requirements of Title IX as set forth in the OCR's 2001 Guidance and the

"Dear Colleague" letter;

(d)     Defendants deliberate decision to allow an unfair tribunal for Plaintiff to

address her grievance wherein her perpetrator was allowed to have an

attorney present at the hearing who directly participated at the hearing, in

direct contravention of UK's Policies and Procedure relating to sexual

assault hearings;

(e)     Defendants' failure adequately screen for a conflict of interest at the initial

Judicial Board Hearing, thereby causing an unreasonable delay to the

Plaintiff; and

(f)     Defendants failure to provide a University Representative who represented

Plaintiff's interests and not that of the University or at least make that

distinction clear to the Plaintiff.

97.     Had Defendants not been deliberately indifferent to Plaintiff's harassment,

discrimination and retaliation, and instead complied with their own policies and federal law by

promptly investigating Plaintiff's rape and providing reasonable accomodations for Plaintiff's

safety, Plaintiff would not have been deprived of equal educational opportunities.

98.     Because of Defendants' deliberate indifference, Plaintiff has suffered losses of educational opportunities and benefits along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma, damage to and delays in pursuit of higher education.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants awarding:

(a)     Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damage for deprivation of equal access to the educational benefits and opportunities provided by UK; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present and future enjoyment of life;

(b)     Injunctive relief to be determined at trial requiring UK to comply with federal law under Title IX;

(c)     Pre- and post-judgment interest;

(d)     Costs;

(e)     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

(f)     Such other and further relief as the Court may deem just and proper.

## COUNT II:

### Violation of Title IX-20 U.S.C. § 1681 (a)

### (Hostile Educational Environment)

99.     Plaintiff re-alleges and incorporates the allegations set forth above in paragraphs 1-98 as though fully set forth herein.

100.    Plaintiff was subjected to physical sexual assault and sexual discrimination and that was so severe, pervasive and objectively offensive that she was denied access to educational opportunities and benefits.

101.    For Plaintiff, UK became a sexually hostile environment where her perpetrators roamed free and could turn up at any moment.

102.    Defendants were deliberately indifferent to Plaintiff's known sexual harassment and the sexually hostile educational environment in which she suffered as a result of its failure to institute reasonable accommodations for the Plaintiff's safety as well as mental well-being, including but not limited to: (i) excluding her perpetrator from campus; (ii) providing Plaintiff assistance in ensuring the perpetrator was not present in social settings involving Greek life, (iii) providing Plaintiff a safe space to study in the library; and (iv) providing a fair and impartial Sexual Misconduct Hearing.

103.    As a result of Defendants' deliberate indifference, Plaintiff was deprived of equal educational opportunities at UK.

104.    Because of the ongoing sexually hostile environment that Defendants deliberately failed to address, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages and losses, including but not limited to:  damage to and delays in pursuit of higher education; and fear, anxiety, trauma and emotional distress.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants awarding:

(a)    Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damage for deprivation of equal access to the educational benefits and opportunities provided by UK; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present and future enjoyment of life;

(b)    Injunctive relief to be determined at trial requiring UK to comply with federal law under Title IX;

(c)    Pre- and post-judgment interest;

(d)    Costs;

(e)     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

(f)     Such other and further relief as the Court may deem just and proper.

**COUNTS AGAINST DEFENDANTS UK, CAPILOUTO, BENDER AND KEHRWALD**

**COUNT: III**

**Negligence**

105.    Plaintiff re-alleges and incorporates the allegations set forth above in Paragraphs 1-104 as though fully set forth herein.

106.    Defendants knew of the wrongful conduct of the perpetrators and/or their propensities to act in a dangerous, reckless, offensive and/or harmful manner.  Upon learning of the sexual assault, Defendants should have immediately begun an investigation as well as put reasonable safeguards in place to protect Plaintiff's interests.

107.    Defendants negligently failed to supervise, investigate and reprimand both perpetrators and failed to take reasonable steps to ensure Plaintiff could safely continue her education at UK.

108.    Defendants also failed to ensure that throughout the process Plaintiff was not further traumatized and re-victimized.

109.    As a proximate result of said negligence, Plaintiff incurred the damages described herein.

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants awarding:

(a)     Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damage for deprivation of equal access to the educational benefits and opportunities provided by UK; and damages for

past, present and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present and future enjoyment of life;

(b)     Injunctive relief to be determined at trial requiring UK to comply with federal law under Title IX;

(c)     Pre- and post-judgment interest;

(d)     Costs;

(e)     Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

(f)     Such other and further relief as the Court may deem just and proper.

## COUNT IV:

### Negligent Hiring, Training and Supervision

110.    Plaintiff re-alleges and incorporates the allegations set forth above in Paragraphs 1-109 as though fully set forth herein.

111.    Based on the aforementioned facts and circumstances, Defendants UK, Capilouto and Bender had supervisory authority over Kehrwald and other UK employees and/or agents.

112.    Upon information and belief, Defendant Bender did not have the requisite credentials and training to perform the job of Interim Title IX Coordinator and that her continued employment by Defendant UK as Interim Title IX Coordinator, resulted in negligent hiring, training and supervision on their behalf.

113.    Upon information and belief, Defendant Kehrwald did not have the requisite credentials and training to perform the job of University Representative and that this was the result of Defendant UK's negligent hiring, training and supervision of Defendant Kehrwald.

114.    Based upon the aforementioned facts and circumstances, Defendants Bender, Kehrwald and other UK employees and/or agents failed to comply with the policies and procedures

28

required of Title IX as well as UK policies and procedures relating to sexual misconduct, assault and harassment.

115.    Furthermore, Defendant UK and Defendant Capilouto had supervisory authority over Defendants Bender and Kehrwald and negligently hired, trained, and supervised them due to Defendants Bender and Kehrwald's failure to comply with the requirements of Title IX and UK policies and procedures relating to sexual misconduct, assault and harassment.

116.    As a proximate result of said negligence, Plaintiff incurred the damages described herein.

<u>**COUNT V:**</u>

**Breach of Contract**

117.    Plaintiff re-alleges and incorporates the allegations set forth above in Paragraphs 1-116 as though fully set forth herein.

118.    Based on the aforementioned facts and circumstances, Defendant UK breached express and/or implied agreement(s) with Plaintiff.

119.    UK's acceptance of Plaintiff into a degree program at UK and her subsequent enrollment and payment of tuition fees created an express contract, or alternatively, a contract implied in law or in fact between UK and Plaintiff, governed by, *inter alia*, the <u>Code of Student Conduct</u>, and the <u>2016 Campus Safety and Security Report</u>  (collectively, the "Regulations") and the parties' reasonable expectations.

120.    The contract formed between Defendant UK and Plaintiff contained the following provisions, among others, that expressly guarantee certain rights to a student:

> UK complies with the federal and state Constitutions, and all applicable federal and state laws, regarding nondiscrimination. Students and applicants for admission to UK, or for financial aid or scholarship, will not be discriminated against because of race, color, national origin, ethnic origin,

29

religion, creed, age, physical or mental disability, veteran status, uniformed service, political belief, sex, sexual orientation, gender identity, gender expression, pregnancy, marital status, genetic information, social or economic status, or whether the person is a smoker or nonsmoker, as long as the person complies with UK policy concerning smoking.[12]

121.    Furthermore, the 2016 Campus Safety and Security Report provided:

The University of Kentucky is committed to providing a safe learning, living, and working environment for all members of the University community. Consistent with this commitment, the University prohibits sexual assault, stalking, domestic violence, dating violence, sexual exploitation, and complicity in the commission of any act prohibited by this regulation, and retaliation against a person for the good faith reporting of any of these forms of conduct or participation in any investigation or proceeding under this regulations (collectively, "prohibited conduct"). These forms of prohibited conduct are unlawful, undermine the character and purpose of the University, and will not be tolerated.

Employees or Students who violate this regulation may face disciplinary action up to and including termination or expulsion. ***The University will take prompt and equitable action to eliminate prohibited conduct, prevent its recurrence, and remedy its effects.*** The University conducts ongoing prevention, awareness, and training programs for Employees and Students to facilitate the goals of this regulation.

Every member of the University community is responsible for to fostering an environment free from prohibited conduct. All members of the University community are encouraged to take reasonable and prudent actions to prevent or stop an act of prohibited conduct. The University will support and assist community members who take such actions.[13]

122.    Defendant UK expressly provided in its Administrative Regulations, in

regards to allegations of sexual assault that:

C. Both the complaining witness and the respondent have the right:
1. To be treated with respect by University officials;
2. To take advantage of campus support resources;
3. ***To experience a safe living, educational, and work environment;***
4. To have up to two (2) support persons present during meetings and hearings;
5. To refuse to have an allegation resolved through conflict resolution procedures;
6. To receive amnesty for certain student misconduct, such as alcohol or drug violations, that occurred ancillary to the incident;

---

[12] University of Kentucky Code of Student Conduct, pg. 3.
[13] 2016 Campus Safety and Security Report, (emphasis added) p. 40-41.

7. To be free from retaliation for reporting violations of this policy or cooperating with an investigation;
**8. To have complaints heard in accord with University procedures;**
9. To be informed in writing of the outcome/resolution of the complaint, sanctions where permissible, and the rationale for the outcome where permissible;
10. To have minimal interaction or contact with the responding party or complaining party; and
11. To request interim remedies from the University to ensure minimal interaction or contact with the responding or complaining party.[14]

123.    Plaintiff asserts that UK, amongst other things, breached these guarantees in failing to provide her reasonable accommodations so she felt she could safely study on campus, taking an inexcusably long time to hold the Sexual Misconduct Hearing Panel and failing to ensure the hearing was fair and impartial and followed internal policies and procedures.

124.    Defendants failed to provide Plaintiff with an environment free from gender-based harassment and discrimination when it failed to take immediate action after Plaintiff reported the sexual assault to ensure she was protected and received adequate assistance.  Further, it allowed Plaintiff to endure additional sexual harassment at the Sexual Misconduct Hearing Panel when issues such as the Plaintiff's appearance were discussed and she was retraumatized with pictures of the bedroom (location of sexual assault) at the hearing.  Additionally, Plaintiff asserts she was not treated with respect by university officials when she was questioned about things such as her virginity as well as the fact that the person that was assigned to advocate on her behalf at the hearing (Kehrwald) so fervently argued against her appeal.

125.    As set forth above, Defendants materially breached these guarantees of providing an environment free from gender-based discrimination and other contractual provisions as elucidated above.

## PRAYER FOR RELIEF

---

[14] Defendant UK's Administrative Regulation 6:2, pg 9.

WHEREFORE, Plaintiff seeks a judgment against Defendants as follows:

a) An Order enjoining Defendants, along with all of UK's agency, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment;

b) Injunctive relief requiring UK to address its violations of Title IX, including (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy, including procedures for effective reporting of sexual harassment incidents, an effective and immediate crisis response, and an expanded victim assistance and protection program; (2) adopting a real "zero tolerance policy" under which there will be expedited proceedings and punishment proportional to the offense for violation of sexual harassment policies; and (3) extensive training of UK faculty and staff regarding the issue of sexual assault and how to properly address the situation with students.

c) An award of damages against both Defendants in an amount to be established at trial, including, without limitation, reimbursement and prepayment for Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to educational benefits and opportunities provided by UK; damages for past, present and future emotional pain and suffering; ongoing and severe mental anguish; and loss of past, present and future enjoyment of life;

d) An award of pre- and post-judgment interest;

e) An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988(b); and

f) Such other relief as is just and equitable.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury as to all matters so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date:   08/21/2017                                  Respectfully Submitted,


                                                    /s/ Lindsay A. Cordes
                                                    Tad Thomas
                                                    Lindsay Anne Cordes
                                                    THOMAS LAW OFFICES
                                                    9418 North Commons Blvd. Ste. 200
                                                    Louisville, KY 40059
                                                    PH: (877) 955-7001
                                                    Fax: (502) 791-8352
                                                    Lindsay.cordes@thomaslawoffices.com

                                                    *Attorneys for Plaintiff*