UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

JANE DOE,  )
   )
   Plaintiff,  )          Civil Action No.
   )          5:17-cv-00345-JMH
v.  )
   )
UNIVERSITY OF KENTUCKY, et al.,  )  **MEMORANDUM OPINION AND ORDER**
   )
   Defendants.  )
   )
   )
   )

**\*\*\*\* \*\*\*\* \*\*\*\* \*\*\*\***

This matter is before the Court upon Defendants' Motion to
Dismiss [DE 13] or, in the alternative, for summary judgment.
Plaintiff has filed a Response, under seal [DE 18], and
Defendants has filed a Reply, under seal, in further support of
their Motion [DE 24]. For the reasons that follow, Defendants'
Motion will be granted.

I.

In evaluating a Rule 12(b)(6) motion, the factual
allegations of the Complaint "must be enough" that the right to
relief is "above the speculative level" and is "plausible on its
face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007);
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the complaint
pleads facts "merely consistent with" liability, it "stops short

1

of the line between possibility and plausibility of entitlement to relief." *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Because certain items from the University's disciplinary proceeding and investigation are presented with respect to some aspects of the request for relief, this motion shall be treated in part as one for summary judgment under Rule 56. *See Song v. City of Elyria*, 985 F.2d 840, 845 (6th Cir. 1993). A motion for summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II.

At all relevant times, Plaintiff Jane Doe was an undergraduate student at the University of Kentucky. Plaintiff's Complaint ¶ 15. Plaintiff served as a Resident Advisor ("RA") for her dormitory and, as a result, had been trained with respect to Title IX and the University policies for reporting and making complaints under Title IX. Compl. ¶ 15.

Prior to the Fall semester of 2016, Plaintiff participated in two weeks of RA training on campus. John Doe Hearing Trans.

at 22. On the night of August 20, 2016, Plaintiff went to dinner with a friend and his father after she had finished training. *Id.* at 22. After dinner, Plaintiff received a text message inviting her to a fraternity party off-campus that evening. *Id.* at 22. Plaintiff knew many members of the fraternity and decided to attend the party. *Id.* at 22. Plaintiff had attended parties hosted by this fraternity before and felt comfortable there. *Id.* at 23. She saw several friends and accepted a beer that was offered to her. *Id.* at 24.

Plaintiff and one of her friends, Michael, wandered around the party for some time as more people arrived. *Id.* at 25. At some point, the party became crowded and Plaintiff recalled accidentally bumping into the same person a number of times. *Id.* at 25. Finally, Plaintiff turned to the person and said "I have been bumped into you enough times I think that it merits being on a first name basis." *Id.* at 25. The person was John Doe, and the two carried on a conversation, realizing that they had previously met at an entrepreneurship event for startup companies in Lexington. *Id.* at 25-26.

After talking for about an hour, John Doe asked if Plaintiff had any plans for the rest of the night. John Doe Hearing Trans. at 28. She informed him that she was an RA, so she had needed to return to the dormitory by the 2:00 a.m. RA

curfew but had no other plans for the evening. *Id.* at 28. John Doe asked her if she would like to walk back to his apartment, which was close to Plaintiff's dorm, and continue their conversation. *Id.* at 28. Plaintiff agreed and left the party with John Doe. *Id.* at 28. As Plaintiff and John Doe walked back to John Doe's apartment, they held hands and continued talking. *Id.* at 29-30. Plaintiff and John Doe kissed in the elevator on the way up to his apartment. *Id.* at 30. Once they reached the apartment John Doe took Plaintiff out to the balcony of his apartment from which she could see her dorm room. *Id.* at 31. Plaintiff and John Doe kissed on the balcony of John Doe's apartment and went back inside. *Id.* at 31.

The two began to play cards and drink vodka and orange juice. John Doe Hearing Trans. at 32. Plaintiff and John Doe began kissing again and walked towards John Doe's bedroom. *Id.* at 33. John Doe "gently" guided to Plaintiff toward the bed and closed the door behind him. *Id.* at 33. Plaintiff did not feel threatened by this. *Id.* at 32. Plaintiff helped undress herself as they continued kissing and laughing. *Id.* at 33-34. Plaintiff voluntarily performed oral sex on John Doe. *Id.* at 34. At some point, Plaintiff stopped performing oral sex and began kissing John Doe again. *Id.* at 34. Plaintiff then requested that John

Doe get a condom. *Id.* at 34-35. At that point, Plaintiff and John Doe engaged in vaginal sexual intercourse. *Id.* at 35-36.

At some point during intercourse, Plaintiff began to cry. John Doe Hearing Trans. at 38. John Doe stopped and asked if she was ok. *Id.* at 38. Plaintiff responded that she was ok. John Doe Hearing Trans. at 38; M. Alexander Investigative Report, attached as Exhibit 1. John Doe reminded Plaintiff that it was almost curfew and they would need to get back to her dorm. John Doe Hearing Trans. at 38. The two got dressed, and Plaintiff put on John Doe's baseball cap backwards and began to play drums on the practice drum set in John Doe's room. *Id.* at 39. John Doe invited Plaintiff to stay the night if she thought she would not be reprimanded for missing curfew. *Id.* at 39. Plaintiff declined, and they walked together for the two blocks to her dorm. *Id.* at 40. John Doe offered to walk Plaintiff to her dorm room door, but Plaintiff declined. *Id.* at 41. Before Plaintiff entered the dormitory, John Doe asked for her number, kissed her goodnight, and asked her to text him when she got to her room. *Id.* at 41. Plaintiff texted John Doe when she went to her room at 1:53 a.m. on August 21. *Id.* at 51-52. The text message stated "[t]hank you for walking me home" and included a text message picture, called an emoji, depicting stars. Text Messages between John Doe and Plaintiff, attached as Exhibit 2.

After returning to her dorm room, Plaintiff texted Dealla Samadi that something had happened and that she was scared. John Doe Hearing Trans. at 41; Text Messages between Plaintiff and D. Samadi, attached as Exhibit 3. Plaintiff also went to the dorm room of her RA mentor, Angelo Ying, that evening. John Doe Hearing Trans. at 41. When she arrived in Ying's room, Plaintiff was upset and crying. *Id.* at 42. Plaintiff told Ying that, during the encounter with John Doe, she had told him to stop. *Id.* at 42. Ying told her that this constituted rape. *Id.* at 42.

Plaintiff also reached out to two other friends during the early morning of Sunday, August 21, 2016: Michael, via text message, and Ethan, via voicemail. John Doe Hearing Trans. at 48-49. The next morning, Dealla met with Plaintiff to talk about what happened as they walked to a coffee shop. *Id.* at 49. Dealla told Plaintiff that "[she] d[id]n't think [John Doe] would ever do this." *Id.* at 49.

Plaintiff saw John Doe at a fraternity event the following Monday. John Doe Hearing Trans. at 52. Plaintiff tried to initiate conversation with John Doe, but he brushed her off. *Id.* at 52-53. Over the next few weeks Plaintiff sent John Doe a number of text messages asking about his classes and if he would meet her for coffee. *Id.* at 53; Texts with John Doe, Ex. 2. After receiving brief or no responses to her text messages,

Plaintiff sent a long text message to John Doe indicating that she had been a virgin and that they had moved too fast during their encounter. John Doe Hearing Trans. at 53; Texts with John Doe, Ex. 2. Plaintiff also indicated that she had wanted to be "there," meaning with him in his apartment, and had chosen to be there that night. John Doe Hearing Trans. at 53; Texts with John Doe, Ex. 2. Plaintiff also told John Doe that, if he was not romantically interested in her, then he should just tell her. John Doe Hearing Trans. at 53; Texts with John Doe, Ex. 2. John Doe indicated that he was not interested in pursuing anything further with Plaintiff. John Doe Hearing Trans. at 53; Texts with John Doe, Ex. 2. Plaintiff replied "I appreciate the honesty [John Doe]. Thats [sic] all I needed to know :)". Texts with John Doe, Texts with John Doe, Ex. 2. Plaintiff later explained that she was in denial about the situation when she sent these messages. John Doe Hearing Trans. at 54.

Plaintiff chose not to report the incident to the University at that time because she was worried about her friends in the fraternity knowing what had happened. John Doe Hearing Trans. at 50-51. At the hearing on this incident, Plaintiff stated that initially her "first concern" with reporting the incident was the effect it would have on her social life because all of her male friends were in this

7

fraternity and all her female friends frequently attended the fraternity's events. *Id.* at 55-56. Angelo Ying ultimately reported the incident to university officials on September 13, 2016. Compl. ¶ 18; John Doe Hearing Trans. at 51. Ying reported that John Doe had "[e]ngaged in vaginal sexual intercourse with the Plaintiff without her consent." Compl. ¶ 18. Upon receiving this report, Deputy Title IX Coordinator Martha Alexander met with the Plaintiff at the University's Violence Intervention and Prevention Center ("VIP") on September 15, 2016. Compl. ¶ 18. Plaintiff told Alexander that she did not want to pursue a formal investigation or hearing process then. M. Alexander Report, Ex. 1. Weeks passed, and Plaintiff requested the issuance of a No Contact order against John Doe on October 6, 2016. Compl. ¶ 18.

Then, on November 9, 2016, Plaintiff indicated to the Title IX office that she wished to pursue a formal investigation against John Doe. Compl. ¶ 19. Alexander began a formal investigation into the matter, which was completed on December 16, 2016. Compl. ¶ 19. Plaintiff remained concerned with how the investigation would interfere with her social life. Compl. ¶ 21. Plaintiff was informed that while the Title IX office appreciated her concern and could provide preliminary sanctions to students involved in investigations, the office has no

oversight over either the Office of Fraternity and Sorority Life or over the actions of the individual fraternities and sororities. Compl. ¶¶ 21-22; Oct. 6, 2016 No Contact Order, attached as Exhibit 4. A no contact order was put in place to ensure that Plaintiff and John Doe would have no physical or verbal interaction. Compl. ¶ 22. Plaintiff was further informed that if she wished preliminary sanctions to be imposed regarding John Doe's contact with his fraternity, she would have need to reach out to the Office of Fraternity and Sorority Life or to his fraternity directly, as the Title IX office has no power to impose such sanctions. Compl. ¶ 21.

Plaintiff chose to contact John Doe's fraternity to seek additional preliminary sanctions, including that she be able to attend events for John Doe's fraternity but John Doe, a fraternity member, be excluded. Compl. ¶ 23. The fraternity decided to require a "sober buddy" to attend fraternity events with John Doe, so as to ensure that no contact between Plaintiff and John Doe occurred. Compl. ¶ 24. Unsatisfied with the fraternity's choice of preliminary sanction, Plaintiff again complained to the Title IX office that she wanted John Doe prohibited from attending his fraternity events. Compl. ¶ 24. The Title IX office again informed her that it did not have the

authority to impose such a sanction as it had no control over fraternity membership or governance. Compl. ¶ 21, 24.

Over the course of the investigation, Plaintiff frequently met with the Title IX office to participate in the investigation of her allegations against John Doe. Compl. ¶ 28. The investigation involved interviewing many students and collecting evidence, such as text messages, one of Plaintiff's journal entries, and dorm entrance logs. *See* M. Alexander Report, Ex. 1. Title IX office officials interviewed Jane Doe and John Doe multiple times on various aspects of the investigation., interviewed six other witnesses, and identified and reviewed more than ten exhibits over the course of the investigation. *Id.* On several occasions, Plaintiff contacted the Title IX office, requesting meetings to discuss additional facts or alter her story. *Id.*

Plaintiff also contacted the Title IX office on numerous occasions to report actions she perceived as violations of the No Contact order. Compl. ¶ 28. In November 2016, Plaintiff alleged that John Doe had followed her home, Compl. ¶ 30, when she saw John Doe on campus outside of Kastle Hall and he followed her from there to her dorm. M. Alexander Report, Ex. 1. The Title IX office immediately investigated this complaint and found that there had been no verbal or physical contact between

the two and that, thus, the no contact order had not been violated. *Id.* Additionally, John Doe reported this incident to the Title IX office as well because he felt Plaintiff was following him. *Id.* He indicated Plaintiff had been walking the same direction behind he and a friend, then quickly passed him only to then walk very slowly directly in front of him. *Id.*

In another complaint, Plaintiff reported that John Doe "came near" her at a football tailgate party hosted by John Doe's fraternity. Compl. ¶ 30; M. Alexander Report, Ex. 1; March 30, 2017 Emails between Pl. and M. Alexander, attached as Exhibit 5. Plaintiff reported that John Doe was present at his fraternity's tailgate and had "looked at her" multiple times but did not contact her. M. Alexander Report, Ex. 1. This complaint was investigated, and it was determined that no violation had occurred because there was no physical or verbal contact between the two. Compl. ¶ 30; M. Alexander Report, Ex. 1. Additionally, witnesses stated that Plaintiff had specifically not been invited to that tailgate but had attended, stayed for five to six hours, and stared at John Doe "the entire time." M. Alexander Report, Ex. 1. Another witness reported that Plaintiff said "[John Doe] doesn't have any right to be here more than me." *Id.* John Doe reported that he was aware Plaintiff was at the tailgate and was careful to have no contact with her while

11

there. *Id.* The Title IX office again concluded that the No Contact order had not been violated.

In another instance, Plaintiff reported that she saw John Doe at a New Year's Eve party and felt this was a violation of the No Contact order. Compl. ¶ 31; M. Alexander Report, Ex. 1. Plaintiff reported that she had been asked not to attend the party and believed this constituted retaliation. *Id.* Again, an investigation into the report was made and it was discovered that the party was not a fraternity function but hosted by an individual at the individual's private residence off campus. *See* Compl. ¶ 31; M. Alexander Report, Ex. 1. Plaintiff had not been invited to this party but attended anyway. M. Alexander Report, Ex. 1. Additionally, John Doe reported he arrived at the party before Plaintiff. *Id.* After she arrived, John Doe was careful not to have any contact with her and directed his friends and the hosts of the party to have no contact with her either. *Id.* The Title IX office informed Plaintiff that they had no authority to force an individual to invite her to or exclude John Doe from a private party. *Id.;* Compl. ¶ 31. The Title IX office suggested that Plaintiff may feel safer during the pendency of the investigation if she tried to avoid events and gatherings that she reasonably believed John Doe would attend. Compl. ¶ 31; M. Alexander Report, Ex. 1.

During this time, John Doe also made reports to the Title IX office indicating that he felt as though Plaintiff was stalking him, citing the same incidents. M. Alexander Report, Ex. 1; Jan. 4, 2017 Emails between Pl. and M. Alexander, attached as Exhibit 6. As a result, on January 9, 2017, the Title IX office amended the No Contact order to indicate that neither party should attend events hosted by a group with which the other party was affiliated while the investigation and hearing process were underway. *See* Compl. ¶ 33; M. Alexander Report, Ex. 1. The first draft of this change was inadvertently overbroad and was promptly amended to reflect that Plaintiff was still permitted to be around members of the fraternity, but not at events hosted by the fraternity unless she received permission to attend from the host. *See* Compl. ¶ 35; Jan. 4, 2017 Emails, Ex. 6. Plaintiff continued to find these measures unsatisfactory and insisted that John Doe should be excluded from participation in his fraternity, even though the investigation and hearing process were not complete. *See* Compl. ¶ 34; Mar. 30, 2017 Emails, Ex. 5.

After months of investigation, the Title IX office informed Plaintiff that they had not found enough evidence to indicate that sexual misconduct had occurred to proceed to a hearing. Compl. ¶ 36. The Title IX office explained that because the

standard under which a respondent can be found responsible for sexual misconduct is "more likely than not," they were doubtful enough evidence would support the allegation and elected not to proceed to a hearing. Compl. ¶ 36. Upon receiving this news, Plaintiff became extremely upset and emotional to the extent that the Title IX office was worried about her emotional state. Compl. ¶ 37; Jan. 9, 2017 Emails between Pl. and M. Alexander, attached at Exhibit 7. Because of Plaintiff's pleas, the Title IX office reconsidered their evaluation and elected to proceed to a hearing. Compl. ¶ 38.

In preparation for that hearing, once a draft of the investigative report regarding this matter was finalized, Alexander scheduled a time for Plaintiff to review the document to ensure her side of the story was accurately reflected. Compl. ¶ 40; Jan. 23, 2017 Emails between Pl. and M. Alexander, attached as Exhibit 8. Anxious to read the report, Plaintiff inquired numerous times as to whether she could bring a copy of the report home to read or receive a copy by email, rather than going to the Title IX office. Jan. 23 Emails, Ex. 8. Alexander explained to Plaintiff that she must come to the office, so as to maintain the confidentiality of the report and be able to voice any concerns she had prior to the report being finalized and presented to John Doe. *Id.* Plaintiff eventually scheduled a

time to review the report in the office. Compl. ¶ 40. While the meeting with Plaintiff was scheduled for an hour, which is typically enough time for complainants to review investigative reports, Plaintiff spent approximately two hours reviewing, discussing, and editing the seventeen page document. Compl. ¶ 41; *see* Jan. 24, 2017 M. Alexander Calendar Entries, attached as Exhibit 9. After Plaintiff reviewed the report for an extended period of time, Alexander informed Plaintiff that John Doe had an appointment to review the report two hours after Plaintiff and would be arriving at the office soon. *See* Jan. 24, 2017 Emails, Ex. 9. Plaintiff continued to review the report and, because of Plaintiff's extension of her meeting time, Plaintiff and John Doe were both present in the Title IX office at the same time. Compl. ¶ 42. Plaintiff never saw John Doe nor was there any verbal or physical contact between the two. Compl. ¶ 42.

Due to Plaintiff's own scheduling conflicts, a hearing could not be held until February 24, 2017.Compl. ¶ 39; Feb. 7, Emails between Pl. and M. Alexander, attached as Exhibit 10. Plaintiff was informed of the hearing procedures and that Defendant Nicholas Kehrwald, interim Dean of Students, would act as the University Complainant in presenting evidence to the hearing panel regarding John Doe's alleged violation of

15

University policies prohibiting sexual misconduct but would not represent the Plaintiff. *See Policy and Procedures for Addressing and Resolving Allegations of Sexual Assault, Stalking, Dating Violence, and Domestic Violence*, Administrative Regulation 6:2, effective June 10, 2016, attached as Exhibit 11; John Doe SMAB Decision, attached as Exhibit 12. In this capacity, Dean Kehrwald would present the University's evidence to the panel and would not be acting as Dean of Students in the hearing but merely as a University representative. AR 6:2, Ex. 11; SMAB Decision, Ex. 12.

Plaintiff was informed that she was permitted to bring two support people with her to the hearing and that these people could be attorneys if she wished. Compl. ¶ 48. She was further informed that, if she chose to bring support persons, they would not be permitted to participate in the hearing because the University's evidence would be presented by the University Complainant, as is required under the policies, but that a support person would be permitted to advise her throughout the proceeding. Compl. ¶ 48; AR 6:2, Ex. 11. Plaintiff was never informed that she did not need a lawyer. In fact, she was informed of her right to obtain a lawyer, as is required under the policies. AR 6:2, Ex. 11. Furthermore, Plaintiff was never informed that Dean Kehrwald would be acting as her lawyer. *Id.;*

SMAB Decision, Ex. 12 at 9. Moreover, hearings on alleged sexual misconduct violations are not adversarial between the complainant and the accused but involve the University presenting evidence regarding an alleged violation of its policies and the accused student defending against the allegation, as is clearly indicated in the policies. Compl. ¶ 48; AR 6:2, Ex. 11.

Dean Kehrwald provided Plaintiff the materials that were to be presented at the hearing prior to the hearing date, so that she could be informed and prepared. Compl. ¶ 49. A day or two prior to the hearing date, Plaintiff inquired as to the absence from evidence of a voicemail from the night of the alleged assault in which Plaintiff can be heard crying. Compl. ¶ 50. Dean Kehrwald had not included it in the materials submitted to the hearing panel because he had concluded there existed sufficient other evidence, including Plaintiff's testimony, text messages, her journal entry, and witness statements to convey her mental state the night of the alleged incident. *See* Compl. ¶ 50; SMAB Decision, Ex. 12 at 4-6.

Prior to the February 24, 2017 hearing, a panel was assembled of three University faculty and staff trained to serve as sexual misconduct hearing panel members, in accordance with University policies. *See* Compl. ¶ 51; AR 6:2, Ex. 11. However,

due to the complex reporting structure of the Office of the Dean of Students, a panel member was selected who indirectly reports to Dean Kehrwald. SMAB Decision, Ex. 12 at 2. This conflict was not discovered until the morning of the hearing. *Id.;* Compl. ¶ 51. In the interest of fairness to all participants, the hearing was rescheduled to the following week and a new panel convened. Compl. ¶ 53; SMAB Decision, Ex. 12 at 2.

While all participants were still in attendance, Dean Kehrwald asked the Hearing Officer, Judge Robert Dyche, if the voicemail could be included in the presented evidence due to the delay in the hearing. Compl. ¶ 54; Feb. Hearing Trans., attached as Exhibit 13; Mar. 1, 2017 Emails between Pl., N. Kehrwald, and R. Dyche, attached as Exhibit 14. After hearing commentary from Dean Kehrwald and John Doe's attorney-support person, Judge Dyche concluded that the voicemail need not come in because evidence on this matter was closed already and this evidence provided no new information. SMAB Decision, Ex. 12 at 4-6. Despite this decision by Judge Dyche, Plaintiff continued to insist to Dean Kehrwald that the voicemail must be admitted at the hearing. Mar. 1, 2017 Emails, Ex. 14. Dean Kehrwald informed Plaintiff that he would continue to make requests to admit the voicemail but that he, too, believed there was sufficient other

evidence and that the voicemail was not necessary. SMAB Decision, Ex. 12 at 4-6.

On March 3, 2017, the hearing was reconvened. Compl. ¶57. During this hearing, Judge Dyche presided as hearing officer and attorney Jane Dyche assisted, as she was training to participate as a Hearing Officer in future cases. Compl. ¶ 57. While Plaintiff's participation in the hearing process is optional under the policies and Plaintiff was given the option to only be present for her own testimony, Plaintiff chose to attend the entire ten hour hearing. Compl. ¶¶ 57, 60-61; AR 6.2, Ex. 11. Plaintiff sought advice and guidance from Dean Kehrwald throughout the proceeding even though Dean Kehrwald acted as University Complainant. Compl. ¶¶ 60-62.

During the course of the hearing, Plaintiff and John Doe, as well as other witnesses, were questioned about all aspects of the case. Compl. ¶¶ 63-66. Testimony included sensitive information about the details of that night. Plaintiff was questioned regarding details she wrote in her journal entry regarding the alleged assault, including what clothing she was wearing, her virginity, and her social life, all of which featured heavily in the journal entry. Compl. ¶ 65; Pl. Journal Entry, attached as Exhibit 15. For illustrative purposes, John Doe used photographs of his bedroom in his defense of the events

that night. Compl. ¶ 66; John Doe Hearing Trans. at 187. Plaintiff was shown these photos for authentication but was never questioned about or asked to identify them. Compl. ¶ 66; John Doe Hearing Trans. at 187. Throughout the course of the hearing, Plaintiff, John Doe, and five other witnesses testified and fourteen exhibits were entered. John Doe Hearing Trans. at 2; Hearing Exhibit List, attached as Exhibit 16. After a full day of testimony, the hearing panel deliberated and found John Doe "not responsible" for the alleged violations of the sexual misconduct policy based on a preponderance of the evidence standard. Compl. ¶ 68; March Hearing Panel Report, attached as Exhibit 17. The hearing panel explained that several inconsistencies in Plaintiff's testimony tended to "indicate that there is some slippage between her experiential reality and what she was able to or willing to convey to [John Doe] in the moment." Hearing Report, Ex. 17. These inconsistencies included her testimony that she affirmatively stated "no" or "stop" but contended John Doe made no response whatsoever, her description of definitive pauses in sexual activity where she "was unable to speak," and her affirmative "yes" when John Doe asked if she was ok. *Id.* Plaintiff was informed of the procedure for an appeal. Compl. ¶ 68. Plaintiff insisted Dean Kehrwald file an appeal with the Sexual Misconduct Appeals Board ("SMAB"). Compl. ¶ 69.

However, Dean Kehrwald informed her he did not believe there were any appealable issues for the University to pursue under the policies, which allow appeals of hearing panel decisions only for violations of due process rights, imposition of inappropriate sanctions, or the existence of new information that would have changed the hearing outcome but was unknown at the time of the hearing. Compl. ¶ 69; AR 6.2, Ex. 11. Simply disagreeing with the hearing panel's outcome is not grounds for an appeal. AR 6.2, Ex. 11; Compl. ¶ 80.

Plaintiff, with the help of her attorney, filed her an appeal with SMAB on March 3, 2017. Compl. ¶ 69; SMAB Decision, Ex. 12 at 3. Dean Kehrwald filed a response defending his actions as University complainant and explaining his reasons for not filing an appeal in this matter. Compl. 71; SMAB Decision, Ex. 12 at 3. SMAB upheld the decision of the Hearing Panel, finding that Plaintiff's due process rights had not been violated and the hearing was fundamentally fair. Compl. ¶¶ 74-76; SMAB Decision, Ex. 12 at 3. SMAB also explained to Plaintiff again that Dean Kehrwald was not meant to act as her attorney but as "akin to a prosecutor working with a victim" and that the University's "goal is often aligned with a complainant" but the University and a complainant "might have diverging interests and

tactics" in some instances. Compl. ¶ 76; SMAB Decision, Ex. 12 at 3.

In early March 2017, after John Doe was found not to have violated the University's sexual misconduct policy, Plaintiff requested John Doe be sanctioned anyway by excluding him from portions of this library where she liked to study. Compl. ¶¶ 26, 79; Mar. 7, 2017 Emails between Plaintiff and M. Alexander, attached as Exhibit 19. Plaintiff reported that she had a particular area in the library in which she liked to study and had seen John Doe in that area on occasion. Mar. 7, 2017 Emails, Ex. 19. Plaintiff indicated there had been no physical or verbal contact with John Doe but that his presence made her feel uncomfortable and unsafe. *Id.* The Title IX office determined this change was inappropriate since John Doe had been found not responsible for sexual misconduct and the two had not had any further verbal or physical contact to date. Compl. ¶¶ 27, 79; Mar. 7, 2017 Emails, Ex. 19. The No Contact order remained in full effect. Mar. 7, 2017 Emails, Ex. 19.

On March 29, 2017, Plaintiff complained to the Title IX office that she was retaliated against by one of John Doe's fraternity brothers. Compl. ¶ 25; Mar. 30, 2017 Emails, Exhibit 5. The incident purportedly occurred on State Street during the student celebration after the UK versus UCLA NCAA Sweet 16

basketball game that spring. Plaintiff alleged that a member of John Doe's fraternity had approached her, pointed at her, and said "Fuck you." Compl. ¶ 25, Mar. 30, 2017 Emails, Exhibit 5. The Title IX office immediately investigated the situation, including interviewing a number of witnesses that Plaintiff identified and the fraternity member Plaintiff accused. Compl. ¶ 25; Mar. 30, 2017 Emails, Exhibit 5. However, the office concluded that no action was necessary because no witness, not even Plaintiff's close friends, was able to corroborate Plaintiff's story or that the accused fraternity member was even at the State Street celebration as Plaintiff that evening. Mar. 30, 2017 Emails, Exhibit 5.

To date, the hearing decision that John Doe was not responsible for violations of the University sexual misconduct policy by a preponderance of the evidence, has been upheld by SMAB and remains in place. Compl. ¶ 80. The No Contact order between Plaintiff and John Doe also remains in place, but no further sanctions have been imposed in light of the finding of no responsibility. [1] *See* Compl. ¶ 80.

---

[1] In the same time period, on or about October 10, 2016, and nearly a month prior to Plaintiff's request to proceed to a formal investigation and hearing on the allegations against John Doe, Plaintiff alleges she was the victim of another sexual assault by a different individual, James Doe. Compl. ¶ 81. That day, Plaintiff attended a football tailgate hosted by James Doe's fraternity (a different fraternity from that of John Doe). J. Enlow Investigative Report, attached as Exhibit 20. James Doe was Plaintiff's physics lab partner. Compl. ¶ 81. Throughout the day, Plaintiff consumed a

significant amount of alcohol and was intoxicated at the tailgate. Enlow Report, Ex. 20. Plaintiff and James Doe decided to leave the tailgate to watch a movie at his apartment. *Id.* Plaintiff had a text message conversation with her friend Dealla explaining where she was going. *Id.* Dealla urged Plaintiff not to go to James Doe's apartment because Plaintiff was intoxicated, stating "[h]ey you've been drinking and I don't think this is a good idea," "ok so youre v[ery] drunk," and "are you POSITIVE you want to go home with him." *Id.*; Text Messages between D. Samadi and Jane Doe, attached as Exhibit 21. Dealla went on to say "… but [Jane] that is the typical "netflix and chill" thing . . . he's going to try to pull some moves . . . and I know you'll say no, but if you know that's what he wants and not what you want then why do you have to go at all." Texts with D. Samadi, Ex. 21. Plaintiff left the tailgate with James Doe and proceeded to his apartment. Enlow Report, Ex. 20. Once at James Doe's apartment, Plaintiff recalled not being able to stay awake or move. *Id.* She also recalled James Doe initiating sexual activity with her. *Id.* Plaintiff told him to stop and tried to push him away but quickly fell back asleep. *Id.* Plaintiff recalled waking up periodically to find James Doe having sexual intercourse with her while she was incapacitated. *Id.*

Plaintiff eventually was able to find her phone and call Dealla for help. Enlow Report, Ex. 20. Dealla picked up Plaintiff from James Does apartment and took her to UK Hospital, where she received a Sexual Assault Nurse Examiner ("SANE") exam and reported the alleged assault to UK Police. Compl. ¶ 81. This incident was also reported to Title IX by friends of Plaintiff. Compl. ¶ 82.

Plaintiff met with Martha Alexander and Jeremy Enlow, Title IX Investigator, on October 13, 2016 at the University's Violence Intervention and Prevention ("VIP") Center. Compl. ¶ 83. Plaintiff indicated she did not want to participate in a formal investigation in the case. Compl. ¶ 83. Plaintiff was informed that, in some instances where the allegations are particularly egregious, the Title IX office will proceed with a formal investigation and hearing without the participation of the complainant in the interest of campus safety. Compl. ¶ 83; AR 6.2, Ex. 11. On October 27, 2016, Plaintiff requested and was issued a No Contact order between herself and James Doe. Compl. ¶ 84. The Title IX office also coordinated with Plaintiff's professor to ensure James Doe and Plaintiff were no longer lab partners. Emails regarding James Doe Lab Section, attached as Exhibit 22. On November 10, 2016, Plaintiff requested James Doe be removed from their shared physics lab section. Compl. ¶ 85. However, during the course of the investigation of this matter, the Title IX office experienced extreme difficulty communicating with James Doe, as he rarely returned calls or emails. Enlow Report, Ex. 20. Enlow even resorted to waiting for James Doe outside his classes to attempt contact in person. *Id.*; Emails regarding Lab Section, Ex. 22. Eventually, the Title IX office was able to reach James Doe and he was removed from the class section. Compl. ¶ 86.

After determining a formal investigation on the incident was needed regardless of the Plaintiff's participation and after an informal investigation, the Title IX office began its formal investigation process on January 6, 2017, after the completion of the formal investigation of Plaintiff's first sexual misconduct complaint against John Doe. Compl. ¶ 87. Despite the difficulty in making contact with James Doe, the Title IX office's formal investigation of this matter was complete by January 23, 2017. Compl. ¶ 87. The investigative report was reviewed by Patty Bender on

III.

Plaintiff's claim for relief under Title IX arising out of student-on-student sexual harassment fails because the facts alleged do not create a triable issue of fact as to whether the funding recipient was deliberately indifferent to the harassment alleged. *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir., 1999) (summarizing the holding in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999)) (describing three *prima facie* elements for a Title IX claim arising from student-on-student sexual harassment: (1) the harassment is so severe, pervasive, and objectively offensive that it deprives the Plaintiff access to educational opportunities or benefits provided by the university; (2) the funding recipient had actual knowledge of the sexual harassment; and (3) the funding recipient was deliberately indifferent to the harassment).

As the United States Supreme Court established in *Davis*, 526 U.S. at 640-641 (1999), an institution "is only liable for

---

March 27, 2017, after the hearing process of Plaintiff's first sexual misconduct complaint was complete. Compl. ¶88. Based on the investigative report, Bender determined the matter should be brought to a hearing. Compl. ¶ 88.

A new hearing panel was convened and met on April 28, 2017. Compl. ¶ 90. Despite being served with notice of the hearing, James Doe did not appear. James Doe SMAB Decision, attached as Exhibit 23. The hearing panel found James Doe responsible for a violation of the University sexual misconduct policy and recommended James Doe's immediate dismissal from the University. Compl. ¶ 90. James Doe appealed the hearing panel decision. *Id.* SMAB upheld the hearing panel's decision and James Doe was dismissed. *Id.*

its own misconduct, since Title IX requires that '[t]he recipient itself...'exclude persons from participation in...deny persons the benefits of, or...subject persons to discrimination under' its 'programs or activities.'" Accordingly, the Court considers Defendant's response to Plaintiff's allegations of an assault perpetrated by a student and its response to allegations of follow-up contact with that student and his friends once a no-contact order was in place. The relevant facts are straightforward. Plaintiff reported the alleged assault, Defendant placed a no-contact order in effect at her request, and Plaintiff then alleged that she saw the accused student in passing on a limited number of occasions on campus. Finally, she alleges that she was confronted at an off-campus site by a friend of one of the accused students, and that her request for additional sanctions against them was denied. In each instance, the University considered her report and conducted further investigation to better understand the situation and elected not to amend the no-contact order or to pursue further consequences against Doe, his friends, or his acquaintances.

First, Court rejects Plaintiff's argument that the Defendant's response itself created a kind of severe and pervasive harassment. [DE 18 at 22.] Plaintiff asserts that the institution's deliberate indifference in setting up a no contact

order that permitted the encounters she had with John Doe and his friends contributed to a hostile educational environment. *Davis*, 526 U.S. at 636. The Court is not persuaded.

Rather, in this matter, the Court must consider whether the University's response to the alleged conduct (accepting as true for the purposes of this Motion that the conduct of the accused was itself severe, pervasive, and objectively offensive) demonstrates deliberate indifference to the situation. The facts before this Court are distinguishable from those in *Williams v. Bd. of Regents of the Univ. System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), in which the Eleventh Circuit found the University of Georgia acted with deliberate indifference when it failed to implement interim sanctions while investigating and adjudicating a complaint of sexual assault and harassment. In *Williams*, a student was repeatedly raped by several other students in the same night. She averred that the defendants exhibited deliberate indifference to her rights under Title IX because Georgia officials had knowledge that one of the accused students had a significant history of prior incidents of sexual misconduct but still admitted him as a student and placed him, unsupervised and without advising him of the sexual misconduct policy, in a student dormitory for lodging. *Williams*, 477 F.3d at 1287, 1297. Additionally. The Eleventh Circuit held that

Georgia was deliberately indifferent in failing *to do anything at all* during the investigation and adjudication of the case to protect the complainant; that Georgia had failed to take measures to protect the student body at-large from a known danger; and that Georgia's delay in investigating and adjudicating the complaint while a criminal investigation took place was erroneous. *Id.*

"Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents. The test is objective—whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable." *Fitzgerald v. Barnstable School Committee*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009). The Sixth Circuit has repeatedly held that deliberate indifference is lacking where the evidence establishes that the school promptly responded to complaints, investigated the complaint, and either imposed discipline where an individual was found responsible for wrongdoing or took proactive steps to reduce the opportunity for future conduct. *See e.g. Stiles ex rel. D.S. v. Grainger County, Tenn.,* 819 F.3d 834, 849 (6th Cir. 2016) (holding school officials' response to complaints of student-on-

student harassment were appropriately based on "conversations with alleged offenders and eyewitnesses, the offending student's record of similar behavior, and school officials' evaluation of the severity of the conduct—all reasonable considerations" designed to reduce the likelihood of future conduct). In this instance, the University did not "brush [Plaintiff] off as hysterical" with regard to complaints she made regarding possible violation of the no contact orders or her requests for amendments to the orders. The University addressed each isolated report but, because none of the reported incidents involved physical or verbal contact between the parties nor did they show evidence that Plaintiff was in danger, the University had no basis to find a violation of the order had occurred or that an amendment should be made.

Additionally, Plaintiff alleges the University was too slow in investigating and adjudicating her complaints. This allegation ignores the fact that at least some of what she views as delay was made at Plaintiff's request. [*See* Alexander Report, DE 13, Ex. 1 at 1-2.] As detailed in the Investigative Report, no complaint was made regarding the alleged August 20, 2016 assault involving John Doe until nearly a month later, on September 13, 2016. *Id*. at 1. Martha Alexander, Interim Title IX Coordinator, met with Plaintiff two days later, on September 15,

2016. *Id.*at 1. Plaintiff initially indicated that she did not want to pursue a formal investigation into the incident and "review of the known facts did not reveal any basis on which to proceed against [Plaintiff's] wishes." *Id.* at 1-2. Almost a month later on October 6, 2016, Plaintiff requested a no contact order and the order was put in place the very same day. *Id.* at 2. Not until November 9, 2016, approximately two-and-a-half-months after the alleged assault occurred, did Plaintiff request a formal investigation be conducted. *Id.* at 2. The report was completed in mid-January 2017 and the subsequent hearing, which Plaintiff requested, was conducted in late February 2017, three-and-a-half months after she requested a formal investigation.

Nor was there a delay suggesting deliberate indifference in the case of James Doe, Plaintiff again wished not to participate in a formal investigation process to address this report. [Enlow Report, DE 13, Ex. 20 at 2.] However, due to the nature of the allegations and after a thorough review of the facts, the University was obligated to pursue a formal investigation despite Plaintiff's lack of participation. *Id.* Prior to and during the investigation process, delay occurred due to the extreme difficulty the University experienced attempting to make contact with James Doe throughout the process. *Id.* at 3. The University zealously attempted to contact James Doe throughout

the process through at least eight telephone calls, seven emails, and even waiting for James Doe twice outside his classes. *Id*. Additionally, James Doe failed to attend at least four meetings Title IX officials had scheduled with him and was forty-five minutes late for one meeting. *Id*. Ultimately, the University moved forward with a hearing without James Doe's participation (despite providing notice to James Doe via email of the date and time of the hearing) so as to adjudicate the matter in as timely a manner as possible. [James Doe SMAB Decision, DE 13, Ex. 23 at 3-5.]

Plaintiff argues that the University's failure to strictly follow its policies constitutes deliberate indifference. However, the Court agrees with the University that Plaintiff's argument here is inappropriately focused on how she, through the University, could punish her alleged assailants – which is not the standard for liability under Title IX. Whether the University failed to discipline is not the question before this Court. Instead, in this lawsuit, she must turn her focus to whether the University acted "clearly unreasonably" in attempting to prevent any harassment. This aspect of Doe's Complaint takes issue with the University's administrative *process* rather than its alleged indifference to Plaintiff's *harassment*. The Court agrees that, on the facts before it,

complaining about the process rather than the response to the alleged harassment itself is simply not actionable by Plaintiff under Title IX.

Further, the Court can find no support in the case law or common sense to suggest that the participation of John Doe's attorney in the hearing process constituted deliberate indifference to the harassment alleged. The University process utilizes a hearing officer, at the time either a retired professor of law or a retired Court of Appeals judge, who makes rulings during the course of the hearing and vests them with the discretion to make a ruling they deem judicious to comport with the Constitution, including issues of due process. [AR 6:2, DE 13, Ex. 11.] In the case of the John Doe hearing, the hearing officer determined that due process required the limited participation of the accused's attorney.

Nor was it actionably unfair for the University to allow participation of John Doe's attorney without providing an attorney to advocate for "her interests" as well. Plaintiff cites no provision for or precedent which suggests that the alleged victim has the right to appointed counsel in a Title IX adjudication process. Nonetheless, Plaintiff was informed that she, too, was permitted to bring an attorney as a support person, and Plaintiff chose not to invite such an individual.

The Title IX adjudication process is not a civil lawsuit between the alleged victim and the respondent. Rather, it is a mechanism for universities to keep their campuses safe by responding to actions in violation of University sexual misconduct policies. Through the hearing process, schools determine whether a violation has occurred. In the case of John Doe, the hearing panel did not find that there was enough evidence to show that he had committed a sexual misconduct violation. Since no violation had occurred, he was not punished, although the no contact order remained in place. As for James Doe, James did not appear at his hearing. As such, a hearing panel found that, based on the testimony provided by the alleged victim only, there was enough evidence to find James Doe had committed a sexual misconduct violation. James Doe was expelled. Plaintiff was not a party in either instance, nor could she be since these were internal University student disciplinary proceedings between the University and the accused students.

Neither can the Court fathom how any reasonable trier of fact could view interviewing her with respect to her complaints or giving her the option to attend or not attend the hearing constitutes deliberate indifference on the facts as averred. The University repeatedly told Plaintiff that she could participate in as little or as much as she wanted to in the investigation

and hearing process. Multiple interviews were conducted to clarify Plaintiff's story and were often at Plaintiff's request when she remembered new aspects of her story. Additionally, Plaintiff was informed that she was not compelled to be in the room for the entire hearing and accommodations could be made so that she was only present for her own testimony. Plaintiff chose to participate at the level she did, and the University cannot be held liable for such a decision. On the facts before this Court, there is no plausible argument that giving "too much" due process required by the Constitution violates Title IX.

Plaintiff seeks discovery to further develop the issue of whether the University's actions constitute deliberate indifference. However, further discovery will not overcome the fact that much of Plaintiff's complaints are about the University's administrative *process,* which is not a viable claim under Title IX, rather than its alleged indifference to Plaintiff's harassment.

**IV.**

Next, the Court concludes that the University has sovereign immunity from suit with respect to Plaintiff's breach of contract claim and any additional negligence claims, so no discovery is needed, despite her arguments to the contrary. *See Green v. Sandy*, 2011 WL 4688639 at *4 (citing *Grinter v. Knight*,

532 F.3d 572 (6th Cir. 2008) (explaining that "the Eleventh Amendment to the Constitution generally bars suits brought in federal court against a state and its agencies"); *Hutsell v. Sayre,* 5 F.3d 996, 999–1000 (6th Cir.1993) (explaining why the University of Kentucky was an "arm of the state under state law"); *see also Lexington-Fayette Urban County Government v. Smolcic*, 142 S.W.3d 128, 135 (Ky. 2004) ("[i]mmunity from suit includes protection against the cost of trial and the burdens of broad-reaching discovery that are peculiarly disruptive of effective government")).

## V.

Nor can Plaintiff state a viable claim of negligence against the defendants in their individual capacities on the facts averred.[2] Any liability under Title IX resides solely with the University, *Soper*, 195 F.3d at 854 ("only recipients of federal funds may be liable for damages under Title IX"), and Plaintiff has identified no legal duty owed to her by the defendants in their individual capacities. In the absence of any duty owed to the Plaintiff, her negligence claims fail.[3] *Ashcraft*

---

[2] Her original complaint does not recite breach of contract claims against the individual defendants, and the Court will not consider them.

[3] Accordingly, it is not necessary to conduct discovery to ascertain whether individual Defendants are entitled to qualified official immunity with respect to this claim.

*v. Peoples Liberty Bank & Trust Co., Inc.*, 724 S.W.2d 228, 229 (Ky. Ct. App. 1986) ("If no duty is owed by the defendant to the plaintiff, there can be no breach thereof, and therefore no actionable negligence.").

In the alternative, to the extent that Plaintiff seeks to hold Capilouto and Bender responsible for negligent failure to supervise Dean Kehrwald, her claim is barred by the doctrine of qualified immunity, as the hiring and supervision of employees is an inherently discretionary function. *See Doe v. Patton,* 381 F. Supp. 2d 595, 603 (E.D. Ky. 2005) *aff'd sub nom. Doe v. Magoffin County Fiscal Court,* 174 Fed. Appx. 962 (6th Cir. 2006) (dismissing claims for negligent supervision on the basis of qualified official immunity holding "Salyer's supervision of Patton was entirely discretionary and Doe has not demonstrated any ministerial duties Salyer violated in his supervision of Patton"). While she argues that an employer has a ministerial duty to "at least attempt to hire someone who is not incompetent," Pl. Resp., Doc # 18 at 36 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 528 (Ky. 2001)), she has hardly averred facts that would bring this matter into the ambit of a case like *Whitt v. Reed*, 239 S.W.2d 489, 491 (Ky. 1951), in which a board of education was found negligent for hiring a school principal to install plumbing with no indication that the principal could

adequately perform that task. Rather, it is more analogous to the facts of *Yanero* itself, in which the Kentucky Supreme Court found that a member of the board of education did not breach this minimal ministerial duty to hire someone "not incompetent" when he participated in hiring a person as an assistant baseball coach with no educational or professional experience coaching but who did have several years of volunteer coaching experience. *Yanero*, 65 S.W.3d at 528. Dean Kehrwald served in a similar position at the University of Kansas prior to his employment at the University of Kentucky, without some additional averment, the Court is unpersuaded that there are facts averred from which a jury could find that he did not have the minimal requisite experience and education to be considered for the position at the University and was clearly incompetent in the same way as a school principal hired to install plumbing. Further, she has averred no facts from which a finder of fact could determine that the performance of this discretionary duty was not "made in good faith (i.e., [was] not made in 'bad faith,'" *Rowan C'nty v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (Good faith is effectively a "presumption that exists absent evidence of 'bad faith.'") As such, Plaintiff's claim of negligent hiring or supervision fail as a matter of law because those tasks are inherently discretionary and there are no facts averred from which a finder

of fact could determine that the defendants did not act in good faith.

III.

Accordingly, **IT IS ORDERED** that Defendants' Motion to Dismiss [DE 13] or, in the alternative, for summary judgment is **GRANTED.**

This the 18th day of January, 2019.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge